# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| TRAVIS A. CAMPBELL, | |
| Plaintiff, | No. C05-0116 |
| vs. | **ORDER** |
| JOANNE B. BARNHART, Commissioner of Social Security, | |
| Defendant. | |

_____

This matter comes before the court pursuant to briefs on the merits of this application for disability insurance benefits. The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.§636(c). The court finds in favor of the defendant and the matter is dismissed.

PROCEDURAL BACKGROUND

Plaintiff Travis Campbell applied for Title XVI Supplemental Security Income on April 23, 2003, as a disabled individual under age 18, due to oppositional defiant disorder (ODD) and attention deficit hyperactivity disorder (ADHD). His application was originally denied and his request for reconsideration was also subsequently denied. A hearing before Administrative Law Judge (ALJ) Benjamin F. Parks was held on September 21, 2004. In an opinion dated October 8, 2004, the ALJ denied benefits. On May 3, 2005, the Appeals Council denied the plaintiff's request for review.

## FACTUAL BACKGROUND

The plaintiff was born on June 16, 1996. (Tr. 40). He is eight years old and currently in the third grade. (Tr. 207).

On April 9, 2002, the plaintiff was evaluated by Susan Connell at the Grant Wood Area Education Agency. (Tr. 118-124). The plaintiff's parents, Mark and Carrie Campbell, described a difficult temperament and violent behavior at home. Ms. Connell noted that the plaintiff was cooperative and pleasant during the testing, but seemed to want to do things his own way. (Tr. 119). The plaintiff tested in the average range for hearing, speech, language, and impression, and had unremarkable neurological and neurodevelopmental evaluations. (Tr. 120). Ms. Connell noticed symptoms of attention deficit disorder and stated that these symptoms were likely developmental. (Tr. 120).

The plaintiff was again evaluated by the Grant Wood Area Education Agency on May 6, 2002. In a report prepared by Tiersa Frasher, it was noted that the plaintiff had normal health, motor development, and neural development. (Tr. 105-106). Ms. Frasher reported that the plaintiff had strong academic skills and was able to be successful and concentrate on activities in a small group setting. (Tr. 105). Ms. Frasher noted that the plaintiff had a difficult time understanding other people's points of view and challenged direction. (Tr. 105). Ms. Frasher stated that the plaintiff confused details in a set of directions, but could be successful when adults or peers keep him focused through questions. (Tr. 105). Ms. Frasher stated that the plaintiff need not be pulled out of class for the entire day and that there were no academic concerns for the plaintiff at the time. (Tr. 106).

A behavior observation was performed on February 27, 2003, by Jennifer Copeland at the Grant Wood Area Education Agency. (Tr. 115-117). Ms. Copeland stated that the plaintiff had good verbal skills and could work at grade level in reading and math. (Tr. 115). Ms. Copeland observed that the plaintiff was easily overwhelmed by age-appropriate tasks and reacted to situations with explosive responses and aggression.

2

(Tr. 115). In one-on-one interaction Ms. Copeland stated that the plaintiff was "friendly and warm" and that he was not unpopular with his peers. (Tr. 115).

On May 17, 2002, the plaintiff was brought into the Abbe Center for Community Mental Health by Ms. Campbell for an evaluation. (Tr. 178-181). Ms. Campbell was concerned with the plaintiff's aggressive behavior at home and at school. (Tr. 178). Ms. Trina Reitner noted in her report that the plaintiff had behavior problems at school for which he was often taken out of the classroom. (Tr. 178). Ms. Reitner opined that the plaintiff was 2-3 months behind, academically. (Tr. 178). Ms. Reitner also noted that the plaintiff has a family history of ADHD and depression. (Tr. 179). Ms. Reitner diagnosed the plaintiff with attention deficit disorder and adjustment disorder and sets his GAF at 50. (Tr. 181).

The plaintiff met with Ms. Reitner from May 17, 2002 through July 16, 2004 regularly to work on anger management. (Tr. 161-181, 190-200). On July 16, 2002, an assessment was made by Dr. Larry L. Richards, also at Abbe Center for Community Mental Health. (Tr. 174). Dr. Richards noted that the plaintiff showed many symptoms associated with ADHD, including failure to pay close attention to detailed, difficulty sustaining attention, not listening, difficulty following through and finishing, difficulty organizing, losing things, easily distracted, and forgetful. (Tr. 174). Dr. Richards also noted that the plaintiff exhibited many symptoms associated with ODD, including losing his temper, arguing with adults, acting defiantly, annoying others, and blaming others. (Tr. 174). Dr. Richards diagnosed the plaintiff with ODD, ADHD, and angry episodes. Dr. Richards set the plaintiff's GAF at 50-41 and prescribed Adderall, 5mg, to be taken three times a day. (Tr. 176).

From the period of July 10, 2002 through October 2, 2002, Ms. Reitner noted progression in the plaintiff's behavior and low ADHD symptoms during their sessions. (Tr. 168-173). Ms. Reitner raised the plaintiff's GAF to 60. (Tr. 168).

Dr. Richards again examined the plaintiff on September 11, 2002, and noted that the medication made a great difference in the plaintiff's behavior and that Ms. Campbell was pleased with his progress. (Tr. 170). Dr. Richards raised the plaintiff's GAF to 60/51. (Tr. 170).

The plaintiff visited Dr. Gary D. Gray complaining of a tic on September 30, 2002. (Tr. 148). Dr. Gray determined that the tic was secondary to the plaintiff's Adderall prescription. (Tr. 148).

On October 28, 2002, the plaintiff was brought in to Ms. Reitner for an emergency session. (Tr. 167). Ms. Reitner's report noted that the previous week plaintiff had broken a teacher's thumb while being restrained. (Tr. 167). Ms. Reitner noted the plaintiff's continued inflexibility in his behavior and lowered his GAF to 50. (Tr. 167).

The plaintiff visited the University of Iowa Health Care Center on November 8, 2002 for an evaluation. (Tr. 140-143). The overall evaluation, completed by Dr. Brenda Cruikshank, restated the plaintiff's problems at home and at school. (Tr. 140-141). Dr. Cruikshank's evaluation of the plaintiff's in-clinic behavior and psychology was quite different from the reports she heard from Ms. Campbell and the plaintiff's teachers. Dr. Cruikshank stated, "The child that we saw today in clinic was much different from the one that has been described at home and in the reports from his teachers at school. Travis has a lot of affection for his mother hugging her frequently and played both in settings of attention and demand without incident." (Tr. 142). Dr. Cruikshank recommended that Ms. Campbell seek treatment for her depression in order to help the plaintiff more at home. (Tr. 143).

While at the University of Iowa Health Care Center, the plaintiff also participated in a psychological evaluation by Dr. Linda J. Cooper-Brown. (Tr. 144-147). Dr. Cooper-Brown observed the plaintiff's behavior and noted that it suggested that the plaintiff can "be attentive and cooperative for extended periods of time." (Tr. 145). Dr. Cooper-Brown also stated that aggressive behavior at home was a problem shared by all the

4

children living with the plaintiff and behavior management techniques should be used for all the children at home. (Tr. 145).

On November 20, 2002, the plaintiff again visited Dr. Richards for an evaluation. (Tr. 165). Dr. Richards' report stated that Ms. Campbell requested some medication to help the plaintiff with his disruptive behavior. (Tr. 165). Dr. Richards prescribed .25mg Risperdal and set the plaintiff's GAF at 60/51. (Tr. 165).

An Individualized Education Program (IEP) for the plaintiff was completed on May 15, 2003. (Tr. 69-83). The meeting was attended by Mr. and Ms. Campbell; Steve McPherson, LEA representative/designee; Donna DeShaw, general education teacher; Tony J. Bowen, special education teacher; Marilyn Nielsen, general education teacher; and Deanice Ludloph, special education teacher. (Tr. 69). The report stated that the plaintiff was on medication which helped with his behavior and focus problems. (Tr. 69). However, the report also stated that the plaintiff did not get his medication refilled consistently and when he was not on his full medication it greatly impacted his behavior. (Tr. 70). The report stated that the plaintiff was in special education for up to 90% of his school day. (Tr. 71). The plaintiff functioned at an average level at school, though because of his behaviors was sometimes behind his peers academically. (Tr. 72). A follow-up report card was given on October 17, 2003, to determine if the plaintiff had met his IEP goals. (Tr. 82). The report found that the plaintiff had met and exceeded all of his goals, succeeding with appropriate behavior 90% of the time. (Tr. 82).

The plaintiff's teacher, Mr. Bowen filled out a teacher questionnaire regarding the plaintiff's behavior and development on May 20, 2003. (Tr. 96-103). In the area of acquiring and using information, Mr. Bowen rated the plaintiff with a serious problem or very serious problem in 7 of the 10 categories. (Tr. 97). However, Mr. Bowen commented that many of these ratings depend on whether the plaintiff was on his medication. (Tr. 97). In the area of attending and completing tasks, Mr. Bowen rated the plaintiff with a serious problem or very serious problem in all of the categories with a daily

5

problems in four and an hourly problem in nine of the 13 categories. (Tr. 98). Although, again Mr. Bowen commented that the rating varies if the plaintiff has had his medication. (Tr. 98). In the area of interacting and relating with others, Mr. Bowen rated the plaintiff with a serious or very serious problem in all of the categories with a daily problem in five and an hourly problem in eight of the 13 categories. Mr. Bowen commented that the plaintiff lacked social skills. (Tr. 99). In the area of moving about and manipulating objects, Mr. Bowen rated the plaintiff with and obvious problem to a serious problem in all categories. (Tr. 100). In the area of caring for himself, Mr. Bowen rated the plaintiff with a very serious problem in ten out of twelve categories with a daily problem in six and an hourly problem in four of these categories. Mr. Bowen commented that the plaintiff had no fear and performed many dangerous acts in school. (Tr. 101). Mr. Bowen noted that the plaintiff was on medication, but did not take the medication on a regular basis. He also noted that the plaintiff's functioning changed after taking the medication. (Tr. 102). He commented that the plaintiff's parents did not follow through with the plaintiff's medication or school work. (Tr. 102). He also stated that the pharmacy and the doctor thought that the parents were "doing something with the medication". (Tr. 103).

The plaintiff's case development sheet notes a telephone conversation that took place between the plaintiff's teacher and the examiner on June 3, 2003. (Tr. 91-92). The plaintiff's teacher stated that when the plaintiff's medication is given consistently the serious and very serious problems on his teacher questionnaire would range from no problem to a slight problem. (Tr. 91). He also stated that there was a total lack of responsibility on the part of the plaintiff's parents. He noted that Mr. and Ms. Campbell do not get the plaintiff's medication to school and that the pharmacy had contacted the school this year to see if the medication had been getting there. (Tr. 91). He stated that the plaintiff's medication is given at school, but when it runs out Ms. Campbell does not get it refilled promptly. (Tr. 91). The plaintiff's teacher noted that when the medication

6

was finally brought in there were pills missing. (Tr. 91-92). He also noted that there was an incident where the plaintiff had gone six to seven weeks without medication, then brought a knife to school and threatened an associate. (Tr. 92). The plaintiff's teacher commented that Ms. Campbell was unresponsive when the plaintiff has incidents at school and often could not be contacted when the school needed to get a hold of her. (Tr. 92). He stated that the plaintiff is a "bright kid" who is at or above his grade level. (Tr. 92).

On September 30, 2003, Dr. Richards evaluated the plaintiff and stated that school was going well, though the plaintiff was aggressive with his siblings at home. (Tr. 162). Dr. Richards proscribed Prozac at 10 mg every other day and increased Risperdal. (Tr. 162). Dr. Richards also increased the plaintiff's Adderall on February 9, 2004. (Tr. 198).

Mr. Bowen completed another teacher questionnaire signed November 14, 2003. The plaintiff's behavior and development had greatly improved since the previous questionnaire. (Tr. 125-132). In the area of acquiring and using information, Mr. Bowen rated the plaintiff with no problem or a slight problem in 8 out of 10 categories. Mr. Bowen commented that the plaintiff did well in this area in the behavior development room, but his behavior would be different in the general education setting. (Tr. 126). In the area of attending and completing tasks, Mr. Bowen rated the plaintiff with an obvious problem daily in most of the categories and a serious or very serious problem weekly in two of the 13 categories (Tr. 127). In the area of interacting and relating with others, Mr. Bowen rated the plaintiff with an obvious to a serious problem weekly in 12 out of 13 categories. However, Mr. Bowen noted that most incidents occurred on days where the plaintiff had taken no medication. (Tr. 128). In the areas of moving about and manipulating objects and caring for himself, Mr. Bowen stated that the plaintiff had no problems. (Tr. 129-130). Mr. Bowen commented that the plaintiff is someone who cannot function to his fullest ability without medication, but noted that the plaintiff had recently been taking his medication regularly (Tr. 131). Mr. Bowen also noted that Mr. Campbell

had moved out of the house and that the plaintiff seemed more stable in that situation. (Tr. 132).

The plaintiff attended day treatment at St. Luke's Hospital on the suggestion of Ms. Reitner, which resulted in a decrease in fighting with siblings at home. (Tr. 195). As a result, Ms. Reitner raised the plaintiff's GAF to 60. (Tr. 195). Ms. Reitner also noted in her April 16, 2004, report that Ms. Campbell had discussed both the plaintiff and his brother urinating on the floor at home. (Tr. 195).

Dr. Richards increased the plaintiff's prescriptions for Adderall and Risperdal on May 3, 2004 and July 12, 2004, respectively, in response to continued behavioral problems at school. (Tr. 191, 194).

## CONCLUSIONS OF LAW

### Scope of Review

In order for the court to affirm the Administrative Law Judge's (ALJ) findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole. See Lochner v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989). Substantial evidence is more than a mere scintilla. It means relevant evidence a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1997); Cruse, 867 F.2d at 1184; Taylor v. Bowen, 805 F.2d 329, 331 (8th Cir. 1986). The court must take into account evidence which fairly detracts from the ALJ's findings. Cruse, 867 F.2d at 1184; Hall v. Bowen, 830 F.2d 906, 911 (8th Cir. 1987). Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Cruse, 867 F.2d at 1184 (quoting Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966)). The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence.

Gunnels v. Bowen, 867 F.2d 1121, 1124 (8th Cir. 1989); Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

### ALJ's Determination of Disability

Determining whether a claimant under the age of 18 is disabled is evaluated by a three-step process. See 20 C.F.R. §416.924.

> The three steps are:
> (1)  If the child is engaged in substantial gainful activity, disability benefits are denied.
> (2)  If the child is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.
> (3)  If the child's impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If functional limitations caused by the impairment are the same as those of any listing, the impairment is functionally equivalent to the listing.

To determine whether an impairment is functionally equivalent, the ALJ evaluates the claimant in six domains. See 20 C.F.R. §416.926a(b)(1).

> The six domains are:
> (1)  Acquiring and using information;
> (2)  Attending and completing tasks;
> (3)  Interacting and relating with others;
> (4)  Moving about and manipulating objects;
> (5)  Caring for [one]self; and
> (6)  Health and physical well-being.

To be functionally equivalent, a claimant's impairment must result in marked limitations in two of the above domains or extreme limitations in one domain. 20 C.F.R. §416.926a.

Under the first step of the analysis, the ALJ determined that the plaintiff had not engaged in substantial gainful employment since the date of the impairment, or at any time. At the second step, the ALJ determined that the plaintiff had the following severe

impairments: attention deficit hyperactivity disorder and oppositional defiant disorder. At the third step, the ALJ determined that the plaintiff's impairments were not functionally equivalent to one of the listed impairments. The ALJ determined that the plaintiff had a marked limitation in the domain of interacting and relating with others; with a less than marked limitation in the domains of acquiring and using information, attending and completing tasks, and self-care; and no limitation in the domains of moving about and manipulating objects and health and physical well-being.

### ALJ's Assessment of Functional Domains

The plaintiff argues that the ALJ failed to properly apply the definition of "marked" to the attending and completing tasks domain. A marked limitation has occurred when impairments interfere seriously with the plaintiff's ability to "independently initiate, sustain, or complete activities." 20 C.F.R. §416.926a(e)(2)(I). This can occur when only one activity is seriously limited or when the cumulative effects of the plaintiff's impairments limit several activities. Id. A marked limitation is also defined as "more than moderate but less than extreme." Id.

The plaintiff places much emphasis on the November 14, 2003 teacher questionnaire completed by Mr. Bowen. (Tr. 125-132). While the ALJ did cite this questionnaire, he properly made his determination from all of the relevant medical and behavioral evidence. The ALJ must not rely on Mr. Bowen's questionnaire alone in determining the level of the plaintiff's limitation, as "no single piece of information taken in isolation can establish whether you have a 'marked' or an 'extreme' limitation in a domain." 20 C.F.R. §416.926a(e)(4)(I). In addition, the ALJ may find that the plaintiff has a marked limitation even if his test scores meet the definitions, provided if other information in the record show that the plaintiff's "functioning in day-to-day activities is not seriously or very seriously limited by [his] impairment(s)" 20. C.F.R. §416.926a(e)(4)(ii)(B).

The domain of attending and completing tasks encompasses how well the plaintiff is able to focus, how well he finishes his activities, and the ease at which the plaintiff

changes from activity to activity. 20 C.F.R. §416.926a(h). The record, on the whole, supports the ALJ's conclusion that, while the plaintiff has some limitation in the domain of attending and completing tasks, this limitation does not rise to the level of a "marked" limitation. Many observers, including Mr. Bowen, Ms. Reitner, Dr. Richards, and the various school personnel who attended the IEP meeting, stated that the plaintiff's medication greatly helped his behavior and focus problems. (Tr. 69, 102, 168-173). Dr. Cooper-Brown indicated that the plaintiff can "be attentive and cooperative for extended periods of time." (Tr. 145). In addition, Ms. Connell stated the plaintiff "was able to focus quite well on tests that were interesting to him." (Tr. 119). Finally, Mr. Bowen's questionnaire lists the plaintiff's problems with organizing his own things or school materials and completing class/homework assignments as only a weekly problem. (Tr. 127). Thus, the record shows that the plaintiff's "functioning in day-to-day activities is not seriously or very seriously limited by [his] impairments" and therefore, his impairments do not establish a marked limitation in this domain. 20 C.F.R. §416.926a(e)(4)(ii)(B).

### Credibility Determination

The plaintiff claims that the ALJ failed to adequately evaluate Ms. Campbell's credibility. The plaintiff also claims that the ALJ inappropriately used the plaintiff's behavior at trial to discredit him. In addition, the plaintiff claims that the ALJ did not specify the evidence he relied on in reaching his credibility determination. Where an ALJ seriously considers, but for good reason explicitly discredits a plaintiff's subjective complaints, the court will not disturb the ALJ's credibility determination. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).

The ALJ expressly stated several reasons why the plaintiff and Ms. Campbell were not credible. First, he stated the while ADHD was diagnosed at age 5, the claimant had demonstrated average intellectual ability and an ability to maintain focus. There are inconsistencies between Ms. Campbell's testimony of strong symptoms of ADHD and

problems with academics in the record on the whole.  As stated above, many who observed the plaintiff in their professional capacity stated that when the plaintiff had taken his medication properly he was able to concentrate and behave properly at school.  In addition, the plaintiff has been evaluated consistently at his grade level, comparable to his peers. Ms. Frasher stated the plaintiff had strong academic skills and was able to concentrate on activities in a small group setting.  (Tr. 105).  Ms. Copeland noted the plaintiff had good verbal skills and could work at grade level in reading and math.  (Tr. 115).  Ms. Reitner noted low ADHD symptoms in multiple sessions.  (Tr. 168-173).  Dr. Cooper-Brown stated the plaintiff "can be attentive and cooperative for extended periods of time." (Tr. 145).  Mr. Bowen stated that the plaintiff performed at or above his grade level. (Tr. 92).  Thus, there is a great amount of evidence in the record that supports the ALJ's determination that the plaintiff has average intellectual abilities and can maintain attention and concentration.

       The ALJ also stated that some of the plaintiff's disruptive behavior problems have appeared to be related to situational family problems and a lack of positive parental control.  This is also supported by the weight of the evidence.  Many of Ms. Reitner's sessions focused on discussion with the plaintiff changes at home: his mother adopted an additional child, family friends and their children moved in with plaintiff's family, the plaintiff's mother and father divorced, and the plaintiff's father moved out of the home. (Tr. 162-181, 190-200).  Dr. Cooper-Brown observed that aggressive behavior at home was a problem for all the children living in the plaintiff's household and stated the behavior management techniques should be used for all the children at home.  (Tr. 145).  Also, Mr. Bowen reported that the plaintiff's behavior had improved corresponding to a change in home life once Mr. Campbell moved out of the house.  (Tr. 132).  In addition, Dr. Cruikshank suggested that Ms. Campbell seek treatment for her depression in order to help the plaintiff at home.  (Tr. 143).

12

The plaintiff claims that there is not enough evidence to support the IEP report that the plaintiff was not receiving his medication regularly and that it greatly affected his behavior at school. However, there are two additional documents in the record that support this statement. Mr. Bowen's teacher questionnaire, which he signed on May 20, 2003, noted in several separate instances that the plaintiff did not regularly receive his medication and stated that the pharmacy and the doctor thought the parents were tampering with the medication. (Tr. 97-102). The plaintiff's case development sheet also noted an incident, relayed by the plaintiff's teacher, in which the plaintiff went six to seven weeks without taking his medication and that the pharmacy had contacted the school to see if they were receiving the medication. (Tr. 91-92). Although it appears from the trial record that Ms. Campbell knew the plaintiff's medication and frequency, there is substantial evidence in the record as a whole to support the ALJ's determination that the plaintiff was not receiving his medication on a regular basis. (Tr. 224).

The plaintiff's final claim is that the ALJ placed too much emphasis on the plaintiff's behavior at the hearing. It is proper to use the plaintiff's behavior at trial in making a credibility determination. Johnson v. Apfel, 240 F.3d 1147-48 (8th Cir. 2001) (citing Smith v. Shalala, 987 F.2d 1371, 1375 (8th Cir. 1993). The ALJ noted the plaintiff was articulate and able to sit and answer questions at the hearing. The ALJ's observations are echoed by several who observed the plaintiff in the past. Ms. Connell noted that while Mr. and Ms. Campbell described a difficult temperament and violence at home, the plaintiff was cooperative and pleasant during testing. (Tr. 119). In addition, Ms. Copeland noted that the plaintiff was "friendly and warm" and that he was not unpopular with his peers. (Tr. 115). Furthermore, Dr. Cruikshank stated, "The child that we saw today in clinic was much different from the one that has been described at home and in the reports from his teachers at school." (Tr. 142).

The ALJ expressly stated the inconsistencies in the evidence related to his credibility determination. The record on the whole supports his findings. Thus, the plaintiff's claim that the ALJ failed to adequately evaluate Ms. Campbell's credibility lacks merit.

## Development of the Record

The plaintiff argues that the ALJ failed to fully and fairly develop the record with respect to the conflicts regarding the administration of the plaintiff's medication and the plaintiff's participation in day treatment. Because the social security disability hearing is non-adversarial, the ALJ has the duty to develop the facts of the case. Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004). However, the ALJ need not seek clarifying statements or additional information unless a crucial issue is undeveloped. Id.

The plaintiff argues that the IEP should not be relied upon alone in determining that the plaintiff did not regularly receive his medication. However, as previously noted, there are two other pieces of evidence which support the ALJ's finding that Ms. Campbell did not always refill the plaintiff's prescription at the school promptly. Mr. Bowen's teacher questionnaire repeatedly stated that the plaintiff did not receive his medication as often as he should. (Tr. 96-103). Mr. Bowen also communicated the concern of the pharmacy and the doctor that the plaintiff's parents were "doing something" with the medication. (Tr. 103). In addition, the plaintiff's case development sheet noted that the plaintiff's teacher was aware of an instance in which the pharmacy called the school to see if they were getting the medication. (Tr. 91). This issue is also not crucial. The ALJ listed many reasons why the plaintiff and Ms. Campbell were not credible, only one of which was the record of inconsistency in receiving medication. Thus, due to the express reasons given by the ALJ for discrediting the plaintiff and the support found in multiple reports in the record, the ALJ has fully and fairly developed the record with regards to this issue.

The plaintiff also claims that the record has not been fully developed because the ALJ did not subpoena records regarding the plaintiff's day treatment that he received at St. Luke's. However, the ALJ did not err when he relied on the comments of Ms. Reitner

14

and Ms. Campbell that the plaintiff was indeed in day treatment for a short period of time and it resulted in a decrease in fighting between the plaintiff and his brother. (Tr. 195,197). The record contained information stating that the plaintiff participated in day treatment briefly and documented the results of that treatment according to Ms. Campbell. Thus, the ALJ fully and fairly developed the record with regards to this issue.

Upon the foregoing,

IT IS ORDERED that the court finds in favor of the defendant and the matter is dismissed.

January 13, 2006.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT